IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MT. HOPE AUCTION CO., | ) | **COMPLAINT FOR DECLARATORY** |
| | ) | **AND INJUNCTIVE RELIEF** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, United States of America, by authority of the Attorney General of the United States and through its undersigned attorneys, files this Complaint and alleges as follows:

## INTRODUCTION

1.  This is a civil action against Mt. Hope Auction Co. ("Mt. Hope Auction" or "Defendant") for violations of the Animal Welfare Act ("AWA") and its implementing regulations.

2.  Mt. Hope Auction holds a class B "dealer" license issued by the U.S. Department of Agriculture ("USDA").

3.  Congress enacted the AWA for a number of purposes, including to ensure that animals used for exhibition or held for sale are provided humane care and treatment. 7 U.S.C. § 2131. The AWA imposes "minimum requirements" for handling, housing, feeding, watering, sanitation, and adequate veterinary care, among other requirements. *Id.* § 2143(a)(2)(A).

4.   Mt. Hope Auction runs a wide variety of large-scale animal auctions and events at its facility in Millersburg, Ohio. Three times a year, it holds the Mid-Ohio Alternative Animal and Bird Sale ("Alternative Animal Auction" or "Auction"), a multi-day long auction advertised as selling over 200 different species of domestic or exotic animals.[1] The Alternative Animal Auctions typically include thousands of animals and large crowds of people, including families and many who travel from out of state, who attend to participate in the auctions or to view the unique and exotic species on display.

5.   Acting as the auction operator and as a dealer and exhibitor of animals at these events requires Mt. Hope Auction to hold an AWA dealer license and to comply fully with all requirements in the AWA and its regulations and standards for the humane care, handling, transportation, and treatment of all animals present at the facility. Mt. Hope Auction is also bound to maintain all legally required records for auction houses and prohibited from knowingly obtaining any animal from an unlicensed person who does not hold a current, valid USDA license.

6.   Since September 2022, USDA has conducted eleven inspections involving Mt. Hope Auction. All eleven inspections have identified multiple violations of the AWA and its regulations and standards, for a total of 69 AWA violations in less than two years. Thirteen of these violations were classified as critical or direct, the two most serious types of AWA citation.

7.   Mt. Hope Auction has not only accrued a shockingly high quantity of violations in a two-

---

[1] These species include, among others: nilgai, alpaca, zebu, coatimundi, ranch fox, red fox, fennec fox, Jacob's sheep, raccoon, splash Polish chicken, macaw, Senegal parrot, silver chukar partridge, Budgerigar, cockatiel, emu, painted desert sheep, Linnaeus's two-toed sloth, bar-headed goose, white-tailed deer, zebra, rabbit, sugar glider, chinchilla, African crested porcupine, degu, spiny mouse, skunk, coyote, guinea pig, hamster, capybara, bobcat, ring-tailed lemur, squirrel monkey, Patagonian cavy, quail, dromedary camel, red kangaroo, Bennett's wallaby, kinkajou, capuchin monkey, marmoset, bison, yak, and ostrich.

year period but has been cited for the same type of violations again and again. Despite written inspection reports and oral exit interviews after every inspection, as well as an Official Warning from USDA, Defendant has been unable or unwilling to come into compliance with the AWA, showing a disregard for the applicable laws, the well-being of the animals that come to the Auctions, and the safety of the public.

8. Defendant's most frequent violations with respect to its Alternative Animal Auctions involve:

    a. the failure to provide adequate veterinary care to dozens of animals;

    b. the housing of animals in enclosures that are unsafe, unsanitary, or otherwise violate the AWA and its regulations and standards;

    c. the improper handling of animals and allowing members of the public to have contact with and handle animals without employee supervision;

    d. the failure to make and maintain accurate and complete records of consignments and sales; and

    e. accepting and facilitating the sale of animals from unlicensed individuals who are forbidden by law from selling such animals without a USDA license.

9. Defendant's violations of the AWA and its regulations and standards include not providing veterinary care to animals with bleeding wounds or that are unable to stand; swinging a kangaroo around forcefully by its tail; stacking improperly constructed enclosures containing small animals in precarious, tilting towers; and allowing the public to reach inside enclosures to touch bison, coyotes, fox, zebras, monkeys, and other animals without employee supervision.

10. As a USDA-licensed dealer, Defendant is obligated to know and comply with the AWA and its regulations and standards. It has been cited for the violations listed in Paragraph 8 on

numerous occasions. And yet, the problems persist, and animals have suffered at nearly every Alternative Animal Auction since September 2022.

11.  Defendant has had numerous opportunities to correct its unlawful behavior. It has violated the AWA and its regulations and standards and placed the health of animals in serious danger.

12.  Defendant's pattern of behavior and failure to correct the practices underlying its repeat violations will almost certainly continue and will place the health of more animals at future Auctions in serious danger. The most recent inspection, which was conducted between Auctions when no animals were present, revealed that dozens of enclosures intended for use at the next Auction were unsafe and unsanitary. Without an immediate injunction, the animals brought to the next Alternative Animal Auction, scheduled for September 19-21, 2024, will almost certainly face similar conditions as past Auctions and be in serious danger.

13.  The only way to ensure compliance and the safety and well-being of the animals at Mt. Hope Auction is through declaratory and injunctive relief.

## JURISDICTION AND VENUE

14.  The Court has jurisdiction over this action pursuant to 7 U.S.C. § 2146(c) (actions arising under the AWA); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1345 (United States as plaintiff).

15.  Venue is proper in the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. § 1391 and 7 U.S.C. § 2159(a), because the Defendant resides and does business in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in Holmes County, Ohio, within this judicial district.

16.  The Court may grant the requested relief under the AWA, 7 U.S.C. §§ 2146(c) and 2159, and 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief).

4

## THE PARTIES

17.  The Plaintiff is the United States of America. Authority to bring this action is vested in the Attorney General of the United States pursuant to 28 U.S.C. §§ 516 and 519 and 7 U.S.C. §§ 2146(c) and 2159.

18.  Defendant Mt. Hope Auction is a for-profit corporation incorporated in the State of Ohio.  Mt. Hope Auction operates in Millersburg, Ohio, and holds livestock auctions and other sales throughout the year. In addition, three times a year, Mt. Hope Auction holds the Alternative Animal Auction where hundreds or even thousands of animals are consigned to the auction and sold to bidders. As required to obtain and sell AWA-regulated animals in commerce, Mt. Hope Auction holds a class B dealer license from USDA for its Alternative Animal Auctions.

19.  Mt. Hope Auction is a "person" as defined in 9 C.F.R. § 1.1 because it is a corporation or other legal entity.

## LEGAL BACKGROUND

20.  The AWA establishes minimum standards of care and treatment to be provided for certain animals bred and sold for use as pets, used in biomedical research, transported commercially, or exhibited to the public. *See generally* 7 U.S.C. § 2131 *et seq*. It was enacted to "insure that animals intended . . . for exhibition purposes or for use as pets are provided humane care and treatment" and "to assure the humane treatment of animals during transportation in commerce. . . ." *Id.* § 2131(1), (2).

21.  The AWA is administered by the Secretary of Agriculture ("the Secretary") or his representative. 7 U.S.C. §§ 2132(b), 2146. The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary has delegated his authority to the Administrator of USDA's Animal and Plant Health Inspection Service ("APHIS"). APHIS's Animal Care

inspectors—who generally have veterinary or other animal care experience—conduct inspections of facilities to determine compliance with the AWA and its implementing regulations.

22.  The AWA defines a "dealer" as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet . . . ." 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of dealer).

23.  An "exhibitor" is "any person (public or private) exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation . . . ." 7 U.S.C. § 2132(h); *see also* 9 C.F.R. § 1.1 (definition of exhibitor).

24.  The AWA defines the term "animal" to mean "any live or dead dog, cat, monkey (nonhuman primate mammal), guinea pig, hamster, rabbit, or such other warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for research, testing, experimentation, or exhibition purposes, or as a pet," but excludes certain categories, including "farm animals, such as, but not limited to livestock or poultry, used or intended for use as food or fiber, or livestock or poultry used or intended for use for improving animal nutrition, breeding, management, or production efficiency, or for improving the quality of food or fiber."  7 U.S.C. § 2132(g); *see also* 9 C.F.R. § 1.1 (further defining "farm animal" to include domestic species of cattle, sheep, swine, goats, llamas, horses, or poultry normally kept on farms and used or intended for agricultural use).  The Alternative Animal Auctions involve animals covered by the AWA's requirements.

25.  Anyone who falls within the statutory definition of a dealer or an exhibitor must obtain and maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see also* 9 C.F.R. § 2.1(a)(1)

("No person shall operate as a dealer, exhibitor, or operator of an auction sale, without a valid license . . .").

26.  A class "B" licensee is defined as a person "meeting the definition of a dealer . . . and whose business includes the purchase and/or resale of any animal." 9 C.F.R. § 1.1 (definition of class "B" licensee). The regulations explicitly identify that a class "B" licensee "includes brokers, and operators of an auction sale, as such individuals negotiate or arrange for the purchase, sale, or transport of animals in commerce." *Id.* The regulations recognize that brokers and operators at auction sales "do not usually take actual physical possession or control of the animals, and do not usually hold animals in any facilities." *Id.* "A class 'B' licensee may also exhibit animals as a minor part of the business." *Id.*

27.  The Secretary shall issue a license to a dealer upon application, provided that no such license shall be issued until the dealer has demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to 7 U.S.C. § 2133.

28.  By signing the application form, the applicant acknowledges that they have reviewed the AWA and its regulations and standards and "agrees to comply with them." 9 C.F.R. § 2.2.

29.  The Secretary has authority to promulgate regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which include the minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extreme weather and temperatures, adequate veterinary care, and separation by species. 7 U.S.C. § 2143(a)(1), (a)(2)(A). The AWA makes clear that this power extends to "humane standards and recordkeeping requirements governing the purchase, handling, or sale of animals, in commerce, by dealers, research facilities, and exhibitors at auction sales and by the operators of such auction sales." *Id.* § 2142.

30.  Each dealer, including the operator of an auction house, or exhibitor or intermediate handler, must comply in all respects with the regulations and standards for the humane handling, care, treatment, housing, and transportation of animals. 9 C.F.R. § 2.100(a); *see also* 9 C.F.R. § 2.2.

31.  The USDA Animal Welfare Inspection Guide reiterates that the operator of an exotic[2] animal auction must be licensed, must comply with all regulatory requirements, and is responsible for the care of the animals while at the auction.[3] USDA Animal Welfare Inspection Guide ("Inspection Guide") at 4-94, 4-95, *available at* https://www.aphis.usda.gov/sites/default/files/Animal-Care-Inspection-Guide.pdf (last visited Sept. 4, 2024). "Every covered animal that the auction consigns will be regulated while it is within the auction facility." *Id.* at 4-95.

32.  The AWA requires the Secretary to make investigations and inspections as necessary to determine whether any dealer has violated any provision of the AWA, or any regulation or standard issued thereunder. 7 U.S.C. § 2146(a). The AWA requires that "the Secretary shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept pursuant to section 2140 of this title of any . . . dealer." *Id.*

33.  Every operator of an auction sale or broker is required to make, keep, and maintain records which fully and accurately disclose information for every animal consigned for auction

---

[2] An "exotic" animal is defined by regulation as any animal not identified in the definition of "animal" provided in the same regulation that is native to a foreign country or of foreign origin or character, is not native to the United States, or was introduced from abroad. 9 C.F.R. § 1.1. Examples of exotic animals include tigers, camels, antelope, kangaroos, water buffalo, and species of foreign domestic cattle, such as Ankole, Gayal, and Yak. *Id.*

[3]  If the consignor is licensed under the AWA or required to be licensed, the consignor is also responsible for care of the animals while at the auction and for complying with all applicable regulatory requirements. However, this does not reduce the obligations of the auction operator.

or sold, regardless of whether a fee or commission is charged by the auction. 9 C.F.R. § 2.76(a).

These records must include:

(1)  The name and address of the person who owned or consigned the animal(s) for sale;
(2)  The name and address of the buyer or consignee who received the animal;
(3)  The USDA license or registration number of the person(s) selling, consigning, buying, or receiving the animals if he or she is licensed or registered under the Act;
(4)  The vehicle license number and State, and the driver's license number (or photographic identification card for nondrivers issued by a State) and State of the person, if he or she is not licensed or registered under the Act;
(5)  The date of the consignment;
(6)  The official USDA tag number or tattoo assigned to the animal under §§ 2.50 and 2.54;
(7)  A description of the animal which shall include:
(8)  The species and the breed or type of animal;
(9)  The sex of the animal; or if the animal is a bird, only if the sex is readily determinable;
(10)  The date of birth or hatch date; or, if unknown, the approximate age or developmental stage; and
(11)  The color and any distinctive markings; and
(12)  The auction sales number or records number assigned to the animal.

*Id.* § 2.76(a).

34.  Dealers and exhibitors are forbidden from knowingly obtaining any animal from any person who is required to be licensed under the AWA but does not hold a current, valid, and unsuspended license. 9 C.F.R. § 2.132(d).

35.  Each dealer or exhibitor must have an "attending veterinarian who shall provide adequate veterinary care to its animals." 9 C.F.R. § 2.40(a). The attending veterinarian must be employed under formal arrangements. *Id.* § 2.40(a)(1). The dealer or exhibitor must ensure that "the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use." *Id.* § 2.40(a)(2). Each dealer or exhibitor shall establish and maintain programs of adequate veterinary care, including "[t]he use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries" and daily observations of all animals to assess their health and well-

being. *Id.* § 2.40(b)(2), (3). Daily observations can be conducted by someone other than the attending veterinarian, so long as "timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." *Id.* § 2.40(b)(3).

36.  The handling of all animals must "be done as expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort" and cannot include physical abuse. 9 C.F.R. § 2.131(b)(1), (2). If climatic conditions present a threat to an animal's health or well-being, the licensee must take appropriate measures to alleviate the impact of those conditions. *Id.* § 2.131(e).

37.  During public exhibition, any animal must be handled so there is minimal risk of harm to the animal or the public, with sufficient distance and/or barriers between the animals and members of the viewing public to assure the safety of both the animals and people involved. 9 C.F.R. § 2.131(c)(1). A responsible, knowledgeable, and readily identifiable employee or attendant must be present at all times when the public could have contact with an animal. *Id.* § 2.131(d)(2). Animals may be exhibited "only for periods of time and under conditions consistent with their good health and well-being." *Id.* § 2.131(d)(1).

38.  The AWA standards provide several requirements for the facilities where animals are kept. Facilities must be of a material and strength appropriate for the animals involved. 9 C.F.R. § 3.125(a). Indoor and outdoor housing facilities must be structurally sound and maintained in good repair to protect animals from injury and to contain the animals. *Id.*

39.  Animals housed in the same primary enclosure must be compatible and animals housed nearby must not interfere with their health or cause them discomfort. 9 C.F.R. § 3.133.

40.  Animals may be housed in transport enclosures while at an auction facility as long as the enclosures meet the regulatory standards and the animals do not show obvious physical distress.

Inspection Guide at 4-95–4-96. Animals held in transport enclosures at an auction are considered "in transit" for regulatory purposes. *Id.*

41.  The AWA standards set requirements for the primary enclosures used to transport various animals. For example, the primary enclosures for birds must, among other things:

(a) be strong enough to contain the bird securely and comfortably and to withstand the normal   rigors of transportation;

(b) contain no sharp edges, points, or protrusions that could injure the bird;

(c) ensure that the bird cannot put any part of its body outside the enclosure in a way that could injure the bird or other persons or animals nearby;

(d) allow for the quick removal of the bird in an emergency;

(e) contain adequate handholds or handles so it can be lifted without tilting and without the person carrying it coming into contact with the bird held inside;

(f) be marked clearly on top and on one or more sides with the words "Live Animals" with arrows or other markings indicating the correct upright position of the enclosure; and

(g) be properly ventilated, with projecting rims or other construction features to prevent ventilation openings from being obstructed.

9 C.F.R. § 3.162(a), (b). While the exact requirements differ by category of species, many of these requirements apply to the other species covered by the AWA. *See id.* § 3.137 (primary enclosures used to transport live animals not covered by more specific provisions); *id.* § 3.87 (primary enclosures used to transport nonhuman primates); *id.* § 3.36 (primary enclosures used to transport live guinea pigs and hamsters); *id.* § 3.61 (primary enclosures used to transport live rabbits).

42.  Dealers and exhibitors generally must keep primary enclosures used for transport clean,

11

ensure adequate space so the animals may turn around freely and make normal postural adjustments, and ensure that animals transported together are compatible. *See, e.g.*, 9 C.F.R. §§ 3.137(b), (c), (d), 3.162(c), (d), (e), 3.36(b), (c), 3.61(b), (c), (d), (e), 3.87(b), (d), (e).

43. Primary enclosures used to transport live animals shall not be needlessly tilted or stacked in a manner which may reasonably result in them falling. 9 C.F.R. §§ 3.142(c), 3.66(c), 3.167(c), 3.41(c), 3.92(b)(2).

44. Dealers and exhibitors must provide potable water and palatable food for animals. 9 C.F.R. § 3.129(a); *see also id.* § 3.63 (requiring food and water to be provided to rabbits transported for more than 6 hours).

45. With regard to sanitation, the buildings and grounds of a facility must be kept clean and in good repair in order to protect the animals from injury and allow for proper husbandry practices in accordance with the AWA standards. 9 C.F.R. § 3.131(c). Animal feces and urine must be "removed from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors." *Id.* § 3.131(a).

46. Under the AWA, United States district courts "are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of [the AWA], and shall have jurisdiction in all other kinds of cases arising under [the AWA]," except in one instance not applicable here. 7 U.S.C. § 2146(c).

## FACTUAL BACKGROUND

47. At all times relevant to the allegations in this complaint, Defendant Mt. Hope Auction was a dealer as that term is defined in the AWA and its implementing regulations and held USDA license number 31-B-0031.

48. Mt. Hope Auction operates at a facility located at 8076 State Route 241, Millersburg, Ohio, in Holmes County.

49.  At all times relevant to the allegations in this complaint, Defendant was a for profit corporation registered in the State of Ohio.

50.  Defendant's AWA class B license was last renewed in 2023. In June 2023, Thurman Mullet submitted the renewal application identifying himself as the President of Mt. Hope Auction and Chester Mullet as the Vice President of Mt. Hope Auction. For the "maximum number of animals owned, held, maintained, sold, exhibited, or leased at any one time during the period of licensure," Mr. Mullet listed over 34,000 animals.

51.  Mt. Hope Auction's current license expires on September 30, 2024. On April 8, 2024, Mr. Mullet submitted a relicensing application on behalf of Mount Hope Auction. The application again identified Thurman Mullet as the President and Chester Mullet as the Vice President of Mt. Hope Auction. It listed a maximum of over 37,881 animals that Mt. Hope Auction intends to own, hold, maintain, sell, exhibit, or lease at any one time during the period of licensure.

52.  Mr. Mullet amended the relicensing application on July 25, 2024, adding roughly 540 additional animals that Mt. Hope Auction intends to own, hold, maintain, sell, exhibit, or lease at any one time during the licensure period.

53.  The first relicense inspection occurred from July 22 to 25, 2024, and Mt. Hope Auction failed to demonstrate compliance with the AWA. Ex. 1 (July 22, 2024 Relicensing Inspection Report). Defendant will have two more chances to demonstrate compliance before October 5, 2024 in order to be relicensed.

54.  By signing the application forms, Mr. Mullet acknowledged that he had reviewed the AWA and its implementing regulations and standards and agreed that Defendant would comply with them. *See* 9 C.F.R. § 2.2.

55.  Defendant holds the Alternative Animal Auction three times a year, generally in March, September, and November. The Alternative Animal Auction sells thousands of animals annually from a wide range of species: some domestic species like certain sheep and rabbits, some native non-domestic species like bobcats, and many non-native exotic species like red kangaroos, giraffes, ring-tailed lemurs, Egyptian fruit bats, and sloths.

56.  The Auction usually runs for three days. Consignors can generally begin consigning their animals to Defendant the day before the Auction begins. Defendant then auctions off the animals, and, if an acceptable bid is made, the buyer pays Defendant for the animal. Defendant keeps a portion of the proceeds of the sale and passes the rest on to the consignor. If the animal does not sell, Defendant still charges the consignor a minimum commission, and the animal is returned to the consignor.

57.  During the Alternative Animal Auction, Defendant charges a five-dollar admission price per day. Upon information and belief, members of the public have attended the Alternative Animal Auction just to see the animals with no intent of consigning or purchasing an animal. Defendant thus exhibits the animals at the Auction to the public for compensation.

58.  In 2022, the APHIS inspectors' inventory determined that at least 1,026 animals were present during the Auction held in September, and at least 703 animals were present during the Auction held in November. In 2023, the inspectors' inventory determined that at least 3,346 animals were present during the Auction held in March, at least 2,285 animals were present during the Auction held in September, and at least 1,437 animals were present during the Auction held in November. And during the March 2024 Auction, the inspectors counted at least 2,088 animals.

59.  The next Alternative Animal Auction is scheduled for September 19 to 21, 2024.

14

Animals can be brought for consignment starting on September 18, 2024. *See* Mt. Hope Auction Website, available at https://mthopeauction.com/event/mid-ohio-alternative-animal-and-bird-sale/ (last visited Sept. 4, 2024).

60.  Since September 2022, USDA has found numerous violations of the AWA and its regulations and standards at every inspection of Defendant's facility, totaling over 65 AWA violations in less than two years. Many of these AWA violations were "repeat" noncompliant items, meaning that USDA cited Defendant for the same noncompliant item either during the previous inspection or at least three times within the past three years. *See* Inspection Guide at 2-7. Thirteen of the violations identified since September 2022 were classified as either "critical" or "direct," the two most serious types of AWA citation. A "critical" noncompliance is one that has a "serious or severe adverse effect on the health and well-being of the animal[s]" or falls into certain other categories, such as knowingly obtaining an animal from any person who is required to be licensed but does not hold a current, valid license. *Id.* at 2-8, 2-9. A "direct" noncompliance is a critical noncompliance that is having a serious or severe adverse effect on the health and well-being of an animal at the time of the inspection. *Id.* at 2-9.

61.  APHIS inspectors conducted an inspection[4] during the Auction held from September 15 to 17, 2022. During this inspection, the inspectors cited one direct noncompliant item and one critical noncompliant item. The inspectors also documented ten other AWA citations. Ex. 2

---

[4] Most of the inspections conducted for this facility are considered "focused" inspections. A "focused" inspection may include: re-inspection for "direct" noncompliances identified during a previous inspection, re-inspection for a specific noncompliance identified during a previous inspection, a partial inspection of the facility, such as animals only or records only, or a partial inspection to follow up on a public complaint concerning animal welfare. *See* Inspection Guide at 3-27. Most of Defendant's inspections are partial inspections because of the large-scale auctions held at the facility, which requires multiple inspectors and several days for an inspection of the animals and facilities during an auction and then a follow-up inspection to review the records after all records have been compiled. *See id.* at 4-18.

(September 15, 2022 Inspection Report).

62.  From October 21 to November 14, 2022, APHIS inspectors conducted an inspection of Defendant's records from the September 2022 Auction. During this inspection, the inspectors found violations of two different AWA regulations and standards, one of which was a critical noncompliant item. Ex. 3 (October 21, 2022 Inspection Report).

63.  APHIS inspectors next conducted an inspection during the Auction held from November 3 to 5, 2022. Inspectors identified violations of seven different AWA regulations and standards, including five repeat noncompliant items. Ex. 4 (November 3, 2022 Inspection Report).

64.  On January 6, 2023, USDA issued an official warning to Defendant regarding the direct and critical noncompliant items from the September 15, 2022 and October 21, 2022 Inspection Reports.

65.  APHIS inspectors then conducted an inspection during the Auction held from March 23 to 25, 2023. During this inspection, inspectors documented violations of thirteen different AWA regulations and standards, which included eleven repeat noncompliant items. Ex. 5 (March 23, 2023 Inspection Report).

66.  On April 20, 2023, APHIS inspectors inspected Defendant's records from the November 2022 and March 2023 Auctions. Inspectors found one repeat critical noncompliant item and one repeat noncompliant item. Ex. 6 (April 20, 2023 Inspection Report).

67.  APHIS inspectors conducted their next inspection during the Auction held from September 14 to 16, 2023. Inspectors identified violations of seven different AWA regulations and standards, including two direct noncompliant items and three repeat noncompliant items. Ex. 7 (September 14, 2023 Inspection Report).

68.  APHIS inspectors returned to conduct another inspection during the Auction held from

16

November 2 to 4, 2023 and identified violations of six different AWA regulations and standards, including two direct noncompliant items and one repeat noncompliant item. Ex. 8 (November 2, 2023 Inspection Report); Ex. 9 ((November 2, 2023 Inspection Report – Direct Violations).

69.  On February 12, 2024, APHIS inspectors conducted an inspection of Defendant's records from the September and November 2023 Auctions, as well as photos and videos submitted to APHIS that demonstrated violations which occurred during those Auctions. Inspectors cited Defendant for one repeat critical noncompliant item, a critical noncompliant item, and a repeat noncompliant item. Ex. 10 (February 12, 2024 Inspection Report).

70.  APHIS inspectors conducted their next inspection during the Auction held from March 20 to 23, 2024 and identified violations of nine different AWA regulations and standards, including seven repeat noncompliant items. Ex. 11 (March 20, 2024 Inspection Report).

71.  Most recently, APHIS inspectors conducted a focused inspection to follow-up on photos and videos submitted to APHIS that demonstrated noncompliances during the March 2024 Auction and issued three citations, one of which was a repeat critical noncompliant item, and another of which was a repeat noncompliant item. Ex. 12 (July 22, 2024 Inspection Report).

72.  APHIS inspectors also conducted a relicensing inspection from July 22 to 25, 2024. Relicensing inspections are scheduled in advance, unlike other routine or focused inspections. Although Defendant knew that it would be inspected on this day, Defendant was unable to demonstrate compliance with the AWA and its regulations and standards due to the inspectors' identification of five different violations, including one repeat critical noncompliant item and two additional repeat noncompliant items. Ex. 1.[5]

---

[5] If a licensee fails a relicensing inspection, they may request up to two more inspections by APHIS to demonstrate compliance with the AWA and its regulations and standards. 9 C.F.R. § 2.3(b).

73.  Licensees have the right to appeal an inspection report within 21 days of receiving a copy. 9 C.F.R. § 2.13. The inspection report for the focused inspection on July 22, 2024 was appealed, and that appeal is currently pending. All other citations listed in this complaint are ones that have either not been appealed or were appealed and deemed valid by the Animal Care appeal panel.

74.  After every inspection, the inspectors conduct an exit interview with the facility representative and explain what they are being cited for and how to correct it. At times, the inspectors provide reference materials or other assistance in achieving compliance. The inspection reports also explain each citation and what the licensee's obligations are with respect to each violated provision.

I.  **Defendant Has Violated the AWA and Its Regulations and Placed the Health of Animals at the Auction in "Serious Danger" by Failing to Provide Adequate Veterinary Care.**

75.  Since September 2022, Defendant has been cited for failing to provide adequate veterinary care to roughly 39 different animals present at its facility during Alternative Animal Auctions in violation of 9 C.F.R. § 2.40. On several of these occasions, Defendant did not seem to be conducting adequate daily observations of all animals to assess their health and well-being, as required by the veterinary care regulations. *See id.* § 2.40(b)(3).

76.  During the September 15, 2022 inspection of the Auction, APHIS inspectors found a small dead ram in the main sale barn of the facility. (*See* photo below). It was on the ground and partially covered with straw. Ex. 2 at 1. The auction staff had not conducted adequate daily observations to notice the dead ram or to identify prior to its death that it needed veterinary care.



77.  On the last day of the September 2023 auction, APHIS inspectors saw a calf in an abnormal position: lying down with its back legs splayed. A member of the public reported that the calf had been in the same position since the day before. Inspectors notified one of the auction veterinarians of the animal's condition. The calf could not stand, so employees carried the animal out of the paddock. The veterinarian claimed to have no authority to treat the animal and stated that it was taken off site without receiving medical treatment. Ex. 7 at 1. Defendant had not conducted adequate daily observations to identify that this calf was in distress and provide it with adequate veterinary care.

78.  At least 36 other animals from the September 2023 and November 2023 Auctions did not receive adequate veterinary care. Defendant was cited for violating 9 C.F.R. § 2.40(b)(2) in the February 12, 2024 Inspection Report. Ex. 10 at 1-3.

79.  From the September 2023 sale, these animals included, among others:

    A.  two nilgai—a type of Asian antelope—and several cattle that were so emaciated that their ribs, scapula, pelvic bones, and individual vertebrae were visible;

    B.  an alpaca that appeared underweight and lethargic, with a prominent pelvis and ribs

that was seen lying down with its nose pressed into its bedding and not responding to its noisy surroundings;

C.  seven sheep with diarrhea present on their tails or legs, several of which were notably underweight;

D.  two zebus (an exotic cattle species) with dark diarrhea on their hind region and back legs;

E.  a coatimundi with brownish orange diarrhea throughout its enclosure, including on its food and water receptacle;

F.  a fox with discharge from its eyes, shaking its head in discomfort;

G.  a Jacob's sheep with nasal discharge in both nostrils;

H.  a number of the birds with feather loss:

   i.  a splash polish chicken with a swollen underside, feather loss, and reddened skin;

   ii.  two macaws with feather loss on their necks, chest, or legs;

   iii.  two Senegal parrots housed as a pair that had lost almost all of the feathers on their heads and some of their neck feathers;

   iv.  a silver chukar partridge with feather loss on its back near the base of its tail, and also damaged and unkept tail feathers;

   v.  a Budgerigar housed in a group with feather loss on its wing and reddened skin;

   vi.  a cockatiel with feather loss on the back of its head and neck as well as dry, scaly skin in the areas of feather loss;

   vii.  several emus housed in a group with feather loss on a large portion of the

front of their necks.

Ex. 10 at 1-3.

80.  From the November 2023 sale, the following animals did not receive adequate veterinary care:

    A.  an emaciated white park cow with a prominent spine, pelvis, scapula, and ribs;

    B.  a sheep with what appeared to be a swollen prepuce;

    C.  a billy goat with a white, crusty discharge in its left eye;

    D.  a painted desert sheep with white nasal discharge in both nostrils.

*Id.* at 3.

81.  The attending veterinarian and associate veterinarians working at the facility did not recall seeing, evaluating, or treating any of the animals identified as needing veterinary care at the September and November 2023 Auctions. The veterinarians were also unable to provide any veterinary records for the animals or otherwise show that adequate veterinary care was provided. The attending veterinarian stated that he does not consider consigned animals at the auction to be patients of the auction's veterinarians. *Id.* at 1.

82.  A female pheasant from the March 2024 exotic animal sale also did not receive adequate veterinary care. (*See* photo below). The pheasant had a wound on the top of its head one to two centimeters in size that was bleeding. The feathers around the wound and down the animal's neck were wet and matted down from drainage or blood. The pheasant was lethargic, laying down with its head leaning forward and its eye tightly shut, and had little to no reaction to the loud surrounding environment. Ex. 12 at 1.

21



83. Again, the attending veterinarian and associate veterinarians working at the facility did not recall seeing, evaluating, or treating the pheasant. The veterinarians were unable to provide any veterinary records for the pheasant or otherwise show that adequate veterinary care was provided. *Id.* at 1.

84. Mt. Hope Auction has stated that animals consigned at the Auction are the responsibility of the buyers and sellers. Mt. Hope Auction has also failed to ensure that enough employees are present to conduct effective daily observations of the health and well-being of the thousands of animals at the Auction and promptly report such issues to the attending veterinarian. In sum, it has not put in place a program of adequate veterinary care to ensure that its attending veterinarian and veterinary staff are informed of issues with the animals' health and well-being and able to get the animal the needed care. The lack of diligence regarding the health and well-being of the thousands of animals that are part of the Alternative Animal Auctions has caused many animals to suffer, and will continue to do so unless Defendant and its attending veterinarian alter their practices in compliance with the AWA.

85. On the first day of the November 2023 auction, two pairs of Bar-headed geese were held

in a wire-mesh enclosure on a flat-bed cart in an intake area waiting for placement in a sale area. The intake area had a constant flow of human and animal traffic in limited space. The geese were stressed: they were erratically swaying and lunging at the wire sides of the enclosure. Two of the geese trapped their beaks in the wire sides of their enclosures, causing actively bleeding wounds. One goose bled onto the sides of the enclosure and its plumage. (*See* photo below). The veterinary team was notified about both birds. The enclosure for the first bird was moved to a quieter location, but the enclosure for the second bird was left in the same location because the veterinarians thought the birds had settled. Ex. 9 at 1-2.



## II.    Defendant Has Violated the AWA and Its Regulations and Standards and Placed the Health of AWA-Regulated Animals at the Auction in "Serious Danger" by Providing or Allowing Inhospitable Housing Conditions.

86.  Defendant has violated the AWA and placed the animals at the Auction in "serious danger," by allowing animals to be housed in enclosures that are improperly constructed, unsanitary, damaged or broken, too small, improperly stored, or otherwise unsafe for the contained animal.

23

### A.  Unsafe Primary Enclosures

87.  Defendant has violated the AWA and its regulations and standards by providing enclosures for animals that are improperly constructed, damaged, or unsanitary, exposing the animals to unsafe conditions that could cause injury or illness. *See* 9 C.F.R. §§ 3.125(a), 3.131(a), (c).

88.  During the September 15, 2022 inspection, APHIS inspectors witnessed an adult female white-tailed deer trap her front leg in a gap between the wall of her stall and a wooden gate. Before the entrapment, she appeared stressed and was darting around the enclosure trying to climb the walls of the stall. As she slid down, she trapped her leg. The deer thrashed, pulled, and twisted her body to try and free her leg. Because no staff members were close, the inspector had to assist the deer by dislodging her leg, so she did not hurt herself more seriously, and immediately notified the attending veterinarian. The deer limped away and stood holding her leg up while heavily breathing with her mouth open. Ex. 2 at 4-5. Gaps that allow animals' body parts to be entrapped risk injuring the animals.

89.  During the inspection of the March 2024 auction, APHIS inspectors noted several enclosures in a dangerous state of disrepair. One enclosure had a hole in the fence large enough for a zebra to stick its head through into an adjacent enclosure, where it caught its halter on the fence. Fortunately, the zebra removed its head without injury. A different enclosure housing a nilgai had a broken board with a splintered end, and another enclosure housing three young calves had holes in the walls. Ex. 11 at 2.

90.  During the recent July 2024 relicensing inspection, APHIS inspectors noted that many of the enclosures identified as areas that may contain regulated animals during the upcoming September Auction were in need of repair. This included 27 enclosures in the Main Barn, 4

enclosures in the Pipe Barn, and 4 enclosures in the Hog Barn. Additionally, the exterior siding of 8 different sections of Building A had holes. Ex. 1 at 3-4. If the enclosures identified at the July 22, 2024 inspection are not repaired, animals at the upcoming Auction will likely be in danger of injury.

91. APHIS inspectors also observed 34 enclosures identified as ones that may be used in the upcoming September Auction with an excessive accumulation of thick, brownish-black excreta. *Id.* at 4. Poor sanitation threatens the health and well-being of animals that will be brought to Mt. Hope Auction for the impending September 19 Auction.

### B. Lack of Sufficient Food and Water

92. Additionally, Defendant has violated the AWA and its regulations and standards and placed animals in "serious danger" by failing to ensure they have adequate access to food and water. *See* 9 C.F.R. § 3.63(a).

93. On the morning of the first day of the September 2023 auction, APHIS inspectors observed numerous rabbits kept overnight that had been deprived of food and water. If an animal drinks for a significant period of time immediately after being provided with water, it indicates that the animal was thirsty and possibly dehydrated. Once provided with water, one rabbit drank for more than 40 seconds, a nursing rabbit with small kits also in her enclosure drank for more than two-and-a-half minutes, and a third rabbit drank for over four minutes, requiring its water cup to be refilled. Inspectors informed the facility representative about the animals' lack of water, and the remaining rabbits that did not have water were given some. But the next morning, APHIS inspectors again observed rabbit cages without water in a different area of the facility. Once water was provided, one rabbit drank for two minutes, another rabbit drank for over two-and-a-half minutes, a third rabbit drank for four minutes, and five young rabbits in one cage

25

drank for five minutes, pushing each other out of the way to try and get to the water bowl. Ex. 7 at 2. This behavior indicates that the rabbits were dehydrated.

94.  The rabbits were also not provided with adequate food. APHIS inspectors saw one female rabbit with her seven kits trying to reach a half-eaten carrot next to their cage. After an inspector stuck the carrot into the cage, the rabbits were ravenous and pushed each other out of the way to try and eat it, and the kits licked the bars of the cage where the carrot had been. *Id.* at 2.

### C.  Unsafe Transport Enclosures

95.  Defendant has violated the AWA and its regulations and standards and placed the health of animals in "serious danger" by accepting animals housed in inappropriate enclosures for consignment and then storing those enclosures in a manner that creates sanitation issues and other safety concerns for the animals. *See* 9 C.F.R. §§ 3.36(a), (g); 3.61(a), (f); 3.66(c); 3.87(a)(3); 3.137(a), (c), (d), (e); 3.162(a).

96.  Defendant generally keeps small animals consigned to the Auction in the transport enclosure provided by the original owner. Animals can remain in these enclosures for up to three or four days during the Auctions.

97.  During the September 15, 2022 inspection, nineteen enclosures containing thirty-eight sugar gliders did not have solid bottoms to collect the animals' excrement or food and water waste. Instead, the cages were on racks with bars, which allowed feces, food, and water to fall on and into the enclosures housing animals beneath them. Ex. 2 at 6. (*See* photo below).



98.  Also, during that inspection, a multi-level wire chinchilla enclosure housing three chinchillas had so much accumulated excrement that the animals had very little space to move without walking through it. Ex. 2 at 6. (*See* photo below).



99.  APHIS inspectors also saw an albino African crested porcupine housed in an enclosure with wood shavings at the bottom that were completely soaked in excrement and water waste, leaving the animal with no option for moving onto a dry surface. Ex. 2 at 6.

100.  Many of the transport enclosures for rabbits, degus, spiny mice, skunks, coyotes, guinea pigs, and hamsters did not have projecting rims—which ensure that adequate ventilation is available for the animals and help prevent any part of the animal not fully inside the enclosure (like fingers, arms, legs, or ears) from injury if something hits the cage. *Id.* at 3, 5, 7. And the rabbit enclosures were stacked three to four cages high and tightly packed together, reducing the ventilation for the rabbits contained therein. *Id.* at 4. APHIS inspectors also saw three rabbit enclosures with sharp, broken wires that could injure the animals. *Id.* at 3. Additionally, many of the transport enclosures lacked handholds and openings, which allow easy access to move the animals in case of emergency and prevent tilting and human contact with the animals when the enclosure is picked up. *Id.* at 3, 5, 7. None of the transport enclosures observed on September 15, 2022 had markings indicating that they held a live animal or an arrow indicating the correct

upright position of the cage, allowing for inappropriate handling of the animals. *Id.* at 3, 5, 7. These citations were the first of many for these issues.

101.  During the November 3, 2022 inspection, APHIS inspectors again observed that many of the primary transport enclosures for the rabbits and other mammals like degus, skunks, and capybara did not have easily accessible openings, projecting rims, or adequate handholds. Ex. 4 at 2, 4.

102.  At least ten of the rabbit enclosures were made of small, light-weight laundry baskets with a wire covering that buckled and broke when stacked, and three of the enclosures had sharp broken wires. At least two rabbits escaped from their enclosures during the auction. *Id.* at 2.

103.  The rabbits were again stacked three to four enclosures high and packed tightly together on wagons. (*See* photo below). Some of the enclosures were tilting to the point of nearly falling, and heavy wood enclosures were stacked on top of eight light-weight plastic enclosures creating a serious risk of collapse. Ex. 4 at 3.



104.  The transport enclosures for the non-human primates also had openings large enough to allow the animals to put their arms outside of the enclosures, which APHIS inspectors saw at least one squirrel monkey do. *Id.* at 3. This is dangerous for the animals for several reasons. Their arms can become stuck, which can cause injury. Additionally, when they are moved, the animals can grab anyone or anything within reach—including dangerous objects, food, or other animals—or their appendages can be smashed. It can also be dangerous for the public because there is a risk of the non-human primate scratching a person.

105.  At the March 2023 Auction, again, APHIS inspectors observed that many of the primary transport enclosures for the rabbits, guinea pigs, and other mammals like degus, foxes, African crested porcupines, skunks, bobcats, and raccoons did not have easily accessible openings, projecting rims, or adequate handholds. Ex. 5 at 2, 4, 6. And most of the transport enclosures did not have markings indicating that they held a live animal or an arrow indicating the correct upright position of the cage. *Id.* at 3, 5-6.

106.  Also, again, the rabbits were stacked three to four enclosures high and packed tightly together on wagons. *Id.* at 4.

107.  APHIS inspectors again saw transport enclosures for non-human primates like a ring-tailed lemur and a squirrel monkey with openings wide enough to allow the animals to stick their hands and arms outside of the enclosure. Indeed, the lemur physically touched guests who approached its crate. *Id.* at 4.

108.  During the September 2023 Auction, APHIS inspectors monitored the consignment of the animals for a period of time, and during much of that time, the inspectors informed the consignor and often the facility at the time of consignment when the primary transport enclosures did not meet the AWA's standards. Despite USDA's warnings, the vast majority of the enclosures for

the rabbits and many of the enclosures for the other animals consigned to the Auction were not compliant, again lacking projecting rims or handholds. Ex. 7 at 1-3.

109.  Inspectors also observed transport enclosures for non-human primates and birds[6] that allowed the animals to stick different parts of their bodies outside of their enclosures, as well as a pigeon and a pheasant that escaped from their cages. *Id.* at 2-3.

110.  During the November 2, 2023 inspection, APHIS inspectors saw two Bar-headed geese trap their beaks in the wire sides of their enclosures, causing actively bleeding wounds. Ex. 9 at 1-2.

111.  APHIS inspectors also saw numerous other improperly constructed primary transport enclosures for birds. Some of the enclosures did not have a leak-proof bottom or collection tray, allowing for fecal material to contaminate the enclosures beneath them. Additionally, many of the enclosures did not have handholds and were not marked with the words "Live Animal," inviting inappropriate handling, especially in an emergency situation. And APHIS inspectors again saw numerous birds able to stick their heads or other body parts outside of their enclosures, putting them at risk of injury and restricted movement. Ex. 8 at 1-2.

112.  Also at this inspection, roughly half of the rabbit enclosures did not have rims to ensure proper ventilation or adequate handholds, and two of the enclosures had sharp bent or broken wires projecting into the enclosure. *Id.* at 1.

113.  During the March 2024 Auction, APHIS inspectors again saw primary enclosures for three cavy, one capybara, and twelve goats lacking projecting rims that would ensure proper ventilation, as well as markings showing they contained a live animal and the correct upright

---

[6] USDA promulgated AWA standards for the humane handling, care, treatment, and transportation for birds for the first time in February 2023, and they went into effect August 21, 2023. 88 Fed. Reg. 10,654 (Feb. 21, 2023).

position for the enclosures. The goat and capybara enclosures also did not have handholds. Ex. 11 at 3.

114. A quail was also able to push its head through the wire mesh on the side of its enclosure. Ex. 12 at 2.

### D. Incompatible Animals Housed Together

115. Additionally, Defendant violated the AWA and its regulations and standards and placed animals in "serious danger" by housing incompatible animals next to each other. *See* 9 C.F.R. § 3.133.

116. At the March 2024 Auction, three dromedary camels were in adjacent enclosures, where the young camel in the middle enclosure faced harassment from the camels on either side of it. (*See* photo below). On one side, a mature camel would bite at its head and neck, and on the other side, a juvenile camel would slide its neck through the fence and chew on the camel's halter. The mature camel also tried to interact with a zebra housed adjacent to it, causing the zebra to pace back and forth more quickly—a sign of distress. Ex. 11 at 3.



### E.  Insufficient Space in Enclosures

117.   Defendant has violated the AWA and its regulations and standards by allowing animals to be housed in enclosures too small to hold them comfortably and safely. *See* 9 C.F.R. §§ 3.61(c); 3.162(e).

118.   Inadequate space can cause unnecessary discomfort and distress to animals.

119.   During the November 3, 2022 inspection, APHIS inspectors observed that the transport enclosures for an African crested porcupine and fox were not large enough for the animals. When the porcupine laid down, its head touched one end of the enclosure while its quills stuck out from the other end. The fox's body touched all sides of its enclosure, and the animal did not appear able to stand. Ex. 4 at 4. The fox remained in the same spot across multiple days, unable to move into any other position.

120.   At the March 2023 Auction, APHIS inspectors saw that many of the primary transport enclosures were not large enough for the animals. Multiple rabbits could not make normal postural adjustments like standing up or turning around. Ex. 5 at 3. The enclosures for a kangaroo and a wallaby were not large enough for the animals to stand upright, forcing them to hunch. The crates for a red fox and a porcupine also did not allow the animals sufficient space. *Id.* at 5.

121.   During the November 2023 Auction, one rabbit enclosure housing seven adult rabbits was too small for all the animals. The rabbits touched all sides of the enclosure and could not make normal postural adjustments. One rabbit tried to move but fell into the water receptacle. Ex. 8 at 1.

122.   At the same Auction, two enclosures holding chickens did not provide sufficient space for the birds to make normal postural adjustments. *Id.* at 2.

123.   At the March 2024 Auction, inspectors identified a goat transport enclosure housing

twelve young goats without enough space for the animals to turn about freely. (*See* photo below).

Enclosures that are too small inhibit the natural movements of animals and can cause

unnecessary stress and discomfort, as well as injury. Ex. 11 at 3.



124.   Despite many citations over the last two years and repeated discussions with the facility

representatives regarding the specifications for safe enclosures, these problems have persisted.

Without injunctive relief, Defendant is likely to continue housing animals in enclosures that are

in poor repair, present risks to the animal, or are unsanitary. Defendant is also likely to continue

accepting animals in transport enclosures where they are held for days and stacked closely

together without proper ventilation precautions, labeling, emergency access, sufficient space, and

appropriate containment of all body parts.

### III. Defendant Has Violated the AWA and Its Regulations and Placed the Health of AWA-Regulated Animals at the Auction in "Serious Danger" by Allowing for and Using Dangerous Handling.

125. On several occasions, Defendant violated the AWA and put animals at risk by allowing its employees to use dangerous handling practices. *See* 9 C.F.R. § 2.131(b)(1). Mishandling can cause behavioral stress, physical injury, and unnecessary discomfort to animals. It can also risk injury to the people involved.

126. During a sale at the March 2024 Auction, APHIS inspectors observed one of Defendant's employees grabbing an adult red kangaroo by the tail and spinning it around to direct it in the sales ring. The kangaroo repeatedly jumped and pawed at the floor as it struggled to escape the man's grip. Ex. 11 at 1.

127. Defendant's staff also mishandled a goat in a way that could have hurt the animal. One employee grabbed the goat by each side of its head, lifting its front hooves off the ground, and used his knee to slide the animal into the ring. Another employee later grabbed the goat by the skin on its lower back and lifted it off the ground while taking several steps. Ex. 12 at 2.

128. At the March 2023 Auction, APHIS inspectors saw a soaking wet Patagonian cavy in a wet crate. (*See* photo below). A facility representative had placed the animal in the room because it was raining outside but did nothing else to help the animal dry off effectively, which can cause stress and potential illness to the animal. Ex. 5 at 2.



129. In addition to improper employee handling, Defendant has repeatedly failed to comply with the AWA's requirement for sufficient distance or physical barriers between animals and the general viewing public, or the requirement for a responsible, knowledgeable, and readily identifiable employee to be present during all times of public contact with animals. *See* 9 C.F.R. § 2.131(c)(1), (d)(2), (e).

130. Defendant places the animals at the Auction in "serious danger" by failing to prevent the public from touching and harassing the animals.

131. Allowing the public, including children, to directly interact with animals without appropriate employee supervision risks serious injury and disease exposure to members of the public.

132. Public interaction with animals at the Auction is also dangerous for the animals in several ways. People could directly injure an animal through rough handling. People could feed

the animals food and other items that the animals should not eat. Also, the stress of having so many people close to the animals, attempting to interact with them, on top of the stress of an unfamiliar place, and small, often improperly constructed enclosures with no place to hide from view can cause the animals to act in a manner that could injure themselves or the public. Additionally, when it comes to animals that are known carriers of rabies like coyotes, foxes, raccoons, skunks, and bats, if the animal bit a person, then it may need to be euthanized to check for the disease.

133.   At the September 2022 Auction, APHIS inspectors observed members of the public entering a holding area to touch or pet animals that could be dangerous, including coyotes, skunks, raccoons, foxes, and kinkajou. (*See* photo below of a patron touching a fennec fox through its enclosure). This area had a small, easily moveable secondary fence and warning signs about the animals that did little to deter public access. No facility employees were present to stop public handling of the animals, and even after APHIS inspectors notified staff members and the veterinarian of the issue, the area did not have a consistent attendant. Ex. 2 at 1-2.



134.   The inspectors also saw members of the public touching, petting, and hugging a large, mature dromedary camel. (*See* photo below). No facility employees were there to deter public interaction. After inspectors notified auction staff of the issue, an additional wire panel was

added to one of the enclosure's gates, but the public continued to contact the camel via another

gate. Ex. 2 at 2.



135.    During the November 2022 Auction, APHIS inspectors again observed members of the

public entering the holding area with the easily movable secondary fence to touch or pet animals

that could be dangerous such as skunks, racoons, foxes, a kinkajou, and porcupines. Again, no

facility employees were consistently present to deter public handling of the animals even after

APHIS inspectors notified the facility of the issue. Ex. 4 at 1. Members of the public were also

observed petting a dromedary camel and numerous other smaller mammals without any readily

identifiable employee present. *Id.* at 2.

136.    At the March 2023 Auction, APHIS inspectors once again saw members of the public

entering the same holding area to pet skunks, foxes, raccoons, and bobcats. The animals

exhibited behavior indicating stress because of the public's proximity. Some foxes were

repetitively circling in an abnormal pattern, the raccoons were rocking back and forth against the

far side of their cage, and a bobcat was loudly vocalizing and unable to get away from a member

of the public leaning towards it just a few inches away. Ex. 5 at 1. APHIS inspectors also saw

members of the public touching a camel, fox, skunk, and ring-tailed lemur. Due to the high volume of people and animals at the facility and the lack of readily identifiable employees or public barriers, employees are unable to adequately prevent public contact. *Id.* at 2.

137.    During the September 2023 Auction, APHIS inspectors observed members of the public touching rabbits in cages precariously stacked on wagons. The inspectors also saw members of the public touching animals in the auction staging area, including a capuchin monkey, a kinkajou, a fox, and skunks. While there were employees sporadically present, they did not effectively stop these public interactions. Ex. 7 at 1.

138.    APHIS inspectors also again saw members of the public in the hoofstock barn touching and petting two juvenile dromedary camels with no facility employees present. Ex. 4 at 1-2.

139.    At the March 2024 Auction, APHIS inspectors saw a member of the public touching a large, male bison. After the contact, the bison violently struck the gate with its head. Ex. 11 at 1.

140.    In another hoofstock barn, a family, including several children, were seen petting a zebra exhibiting signs of stress and a dromedary camel. *Id.*

141.    Inspectors also observed a family harassing a large ostrich that was able to slide its head and neck through its fence. The group, which included children, gathered around the enclosure, and individuals from the family repeatedly presented their arms to try and get the ostrich to bite. The ostrich bit the coat of one individual, and the group responded by yelling in front of the enclosure. *Id.*

142.    Although the inspectors notified several staff members of the observed animal contacts during the March 2024 Auction, Defendant did not create effective barriers or ensure consistent attendant presence for the duration of the Auction.

143.    Members of the public were even seen entering enclosures and touching the animals

without an attendant present. One man entered a pen with three young calves, cornering and touching one of them. Another man entered a stall with five llamas, holding one by the halter and trying to examine another. *Id.* at 2.

144. Despite numerous citations and exit interviews discussing the need to prevent unsupervised public contact with the animals, these public handling issues have persisted from the September 2022 Auction to the most recent Auction in March 2024.

### IV.   Defendant Mt. Hope Auction Has Violated the AWA and Its Regulations by Repeatedly Failing to Maintain Complete and Accurate Records.

145. Defendant has violated the AWA and its regulations by failing to maintain complete and accurate records of the consigned animals at the Auctions from 2022 to at least July 2024. Defendant has been cited four times for record-keeping violations and each time has received instructions on how to properly fill out auction records. Regardless of USDA's efforts to help Defendant come into compliance with the clear requirements of the AWA regulations, Defendant's failure to make and maintain accurate and complete records has continued. *See* 9 C.F.R. § 2.76(a) (setting requirements for recordkeeping for operators at an auction).

146. Nearly all of Defendant's approximately 1000 records of acquisition from the September 2022 Auction were missing some of the required information for the consignor. About 90% of the records were missing the date of birth or age of the consigned animal. Almost all the records were missing the color and/or distinctive markings for the consigned animals. About 50 records were missing the date of consignment. About 100 records were missing the USDA License number (if licensed) or the vehicle license number and driver's license or state-issued ID (if the consignor was not licensed under the AWA). One record consigning a total of 24 animals was missing the address for the consignor. Many records were missing several pieces of required information. Ex. 3 at 1.

147.   The disposition forms generated by Defendant for the March 2023 Auction did not contain all required information, including the sex and approximate age of the animal and the USDA license number (if the consignor is licensed). Ex. 6 at 1.

148.   Defendant's consignment records for the September and November 2023 Auctions were again incomplete. At least 100 consignor records for both the September and November sales were missing identifying information such as the USDA license number (if licensed) or the vehicle license number and driver's license or state-issued ID (if the consignor was not licensed under the AWA). None of the disposition records from the September and November sales contained the sex or approximate age of the animal as required. Ex. 10 at 3.

149.   At the most recent inspection, 187 consignment records from the March 2024 Auction were again missing required identifying information including the USDA license number (if licensed) or the vehicle license number and driver's license or state-issued ID (if the consignor was not licensed under the AWA). Additionally, 26 disposition records were missing the USDA license number even though the buyer was licensed. Ex. 1 at 1.

150.   Accurate recordkeeping is essential for APHIS to be able to track animal movements and ensure the well-being of animals. Defendant habitually fails to maintain legally required records of the consigned animals at its Alternative Animal Auctions.

**V.   Defendant Mt. Hope Auction Has Violated the AWA by Repeatedly Facilitating Illegal Procurement of Animals.**

151.   Defendant Mt. Hope Auction has violated the AWA and its regulations by knowingly accepting animals for sale from unlicensed individuals who were required to have a USDA license at their Alternative Animal Auctions from 2022 to at least July 2024. *See* 9 C.F.R. § 2.132(d).

152.   Records from the September 2022 Auction show that Defendant knowingly accepted

animals for sale from unlicensed individuals for species that require a USDA license, including: four ring-tailed lemurs, two kinkajou, two capybaras, a zebra, a Patagonian cavy, five foxes, four racoons, four opossum, and two coyotes. Additionally, a seller consigned a porcupine to Defendant with an invalid USDA license number. Defendant can easily verify license numbers using the online USDA, Animal Care Public Search Tool. *See* https://aphis.my.site.com/PublicSearchTool/s/ (last visited Aug. 25, 2024); Ex. 3 at 1-2.

153.   Records from the March 2023 Auction show that Defendant consigned at least 13 animals from unlicensed individuals who were required to be licensed, including a ring-tailed lemur, three camels, three bobcats, two raccoons, and four skunks. Ex. 6 at 1-3

154.   Records from the September and November 2023 Auctions show that Defendant accepted more than 80 animals for consignment from unlicensed individuals who were required to have a USDA license or one-time exemption, including a ring-tailed lemur, five flying squirrels, two short-tailed opossum, and twenty-two skunks.

155.   These consignments happened even though APHIS inspectors were present in the consignment area during both Auctions for part of the time that the Defendant accepted animals. APHIS inspectors advised Defendant how to check if a customer has an active USDA license by using the public search tool. However, a large number of unlicensed individuals were still allowed to consign species that almost certainly required a USDA license to sell when inspectors were not actively observing the consignment. Indeed, during the September 2023 Auction, Defendant's staff were present and aware that APHIS inspectors turned away an unlicensed individual who presented foxes for consignment, yet Defendant's staff accepted those same foxes for consignment later that same day when inspectors were no longer present. Ex. 10 at 4-5.

156.   At the March 20, 2024, inspection, APHIS inspectors personally observed Defendant

knowingly accept four muntjac (small deer) for consignment from an individual who did not have a USDA license. Ex. 11 at 2.

157.   Records from the March 2024 Auction show that Defendant accepted a total of 83 animals for consignment from 43 unlicensed individuals who were required to be licensed, including a camel, 3 chinchillas, a porcupine, a zebra, and 3 ostriches. Ex. 1 at 1-3.

158.   Defendant not only knowingly facilitated illegal procurement of animals but repeatedly did so despite warnings from APHIS inspectors. Defendant has not made any meaningful effort to correct this unlawful conduct in nearly two years.

159.   When unlicensed individuals are allowed to buy or sell animals intended for use as pets or for exhibition without a valid USDA license, it perpetuates illegal and unregulated ownership and trade of these animals. Unlicensed individuals may avoid routine inspections, which could otherwise ensure the humane care of the animals in their possession. It also makes it more difficult to trace the animal's medical or legal history or to determine if other unlawful activity is occurring.[7]

## CLAIMS FOR RELIEF

### Claim 1

**Defendant's ongoing practices have placed the health of animals in serious danger in violation of 7 U.S.C. § 2159 and will place the health of animals in serious danger in the imminent future.**

160.   The United States incorporates by reference all allegations of the Complaint.

161.   Defendant is placing the health of the animals present at the Auction in serious danger in violation of the AWA and its regulations and standards. 7 U.S.C. § 2159(a).

---

[7] Notably, several animals involved in these illegal procurements, including ring-tailed lemurs, are listed as endangered species under the Endangered Species Act, 16 U.S.C. § 1540 *et seq.* The Endangered Species Act imposes additional requirements for the sales of these animals, which are harder to enforce if accurate and complete records are not maintained.

162.   Defendant is a dealer under the AWA because it is a person who, in commerce, for compensation or profit, delivers for transportation, transports, buys, or sells, or negotiates the purchase or sale of animals for teaching, exhibition, or use as a pet. 7 U.S.C. § 2132(f); 9 C.F.R. § 1.1 (the definition of a "dealer" "includes brokers, and operators of an auction sale, as such individuals negotiate or arrange for the purchase, sale, or transport of animals in commerce").

163.   Defendant is placing the health of the animals present at the Auction in serious danger by failing to provide adequate veterinary care or to conduct the required daily observations of all animals to assess their health and well-being in violation of 9 C.F.R. § 2.40(a), (b). Defendant has not fulfilled its obligation to ensure adequate veterinary care to all animals present at the facility during the Auctions. These violations have caused animals to suffer or die at past Auctions.

164.   Defendant is placing the health of the animals present at the Auction in serious danger by failing to provide them with safe and hospitable housing conditions in violation of 9 C.F.R. §§ 3.36(a), (g); 3.61(a), (c), (f); 3.63(a); 3.66(c); 3.87(a); 3.125(a); 3.131(a), (c); 3.133; 3.137(a), (c), (d), (e); 3.162(a), (e). These violations have caused animals injury, stress, discomfort, and suffering at past auctions.

165.   Defendant is placing the health of the animals present at the Auction in serious danger by allowing for and using improper or dangerous handling practices in violation of 9 C.F.R. § 2.131(b), (c), (d), (e). These violations have caused animals stress, discomfort, and suffering at past auctions and exposed them to a risk of injury or other serious harm.

166.   In an announced relicensing inspection conducted on July 22, 2024, dozens of enclosures intended for use in the upcoming September 19-21, 2024 Auction required repairs in order to safely house animals in accordance with the AWA regulations and standards. Animals housed in

these enclosures with broken boards, holes, and other structural defects could suffer injuries or have body parts entrapped. Dozens of other enclosures intended for use in the upcoming September 19-21, 2024 Auction had not been adequately cleaned, with excessive accumulation of excrement on various surfaces. Poor sanitation can lead to contamination or the spread of disease and can attract pests. Ex. 1.

167.  Unless enjoined, Defendant will continue to place the health of animals present at future Alternative Animal Auctions, including the upcoming September 2024 Auction, in serious danger in violation of the AWA and its regulations and standards.

168.  The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2159(b).

## Claim 2

### Defendant has failed to provide adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2)(A) and 9 C.F.R. § 2.40.

169.  The United States incorporates by reference all allegations of the Complaint.

170.  As set forth above, Defendant is violating the AWA and its implementing regulations and standards by failing to provide animals present at the Auction with adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 2.40.

171.  Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering or even the death of animals at its facility.

172.  The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

### Claim 3

**Defendant has failed to provide safe and hospitable housing conditions in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. §§ 3.36(a), (g); 3.61(a), (c), (f); 3.63(a); 3.66(c); 3.87(a); 3.125(a); 3.131(a), (c); 3.133; 3.137(a), (c), (d), (e); 3.162(a), (e).**

173. The United States incorporates by reference all allegations of the Complaint.

174. As set forth above, Defendant is violating the AWA and its implementing regulations and standards by failing to provide animals present at the Auction with hospitable housing conditions in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. §§ 3.36(a), (g); 3.61(a), (c), (f); 3.63(a); 3.66(c); 3.87(a); 3.125(a); 3.131(a), (c); 3.133; 3.137(a), (c), (d), (e); 3.162(a), (e).

175. Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering of animals at its facility.

176. The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

### Claim 4

**Defendant has used and failed to prevent the use of dangerous handling practices in violation of 7 U.S.C. §§ 2142, 2143(a)(1), (2) and 9 C.F.R. § 2.131(b), (c), (d), (e).**

177. The United States incorporates by reference all allegations of the Complaint.

178. As set forth above, Defendant is violating the AWA and its implementing regulations and standards by using and failing to prevent the use of dangerous handling practices in violation of 7 U.S.C. §§ 2142, 2143(a)(1), (2) and 9 C.F.R. § 2.131(b), (c), (d), (e).

179. Unless enjoined, Defendant will continue to violate the AWA, and its regulations and standards, causing needless suffering of animals at its facility.

180. The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C.

46

§ 2146(c).

## Claim 5

**Defendant has failed to create and maintain complete and accurate records in violation of 7 U.S.C. §§ 2140, 2142, and 9 C.F.R. § 2.76(a).**

181.   The United States incorporates by reference all allegations of the Complaint.

182.   As set forth above, Defendant is violating the AWA, and its implementing regulations and standards, by failing to create and maintain complete and accurate records in violation of 7 U.S.C. §§ 2140 and 2142 and 9 C.F.R. § 2.76(a).

183.   The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

## Claim 6

**Defendant has facilitated the illegal procurement of animals in violation of 7 U.S.C. §§ 2134 and 2142 and 9 C.F.R. § 2.132(d).**

184.   The United States incorporates by reference all allegations of the Complaint.

185.   As set forth above, Defendant is violating the AWA, and its implementing regulations and standards, by knowingly obtaining and facilitating the sale of animals from persons who are required to be licensed but do not hold a current, valid USDA license in violation of 7 U.S.C. §§ 2134 and 2142 and 9 C.F.R. § 2.132(d).

186.    The United States is entitled to an injunction to prevent and restrain Defendant from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.   Declare that Defendant has placed and is likely to imminently place the health of animals

at Defendant's facility in serious danger in violation of the AWA and its regulations and standards, 7 U.S.C. § 2159;

2. Declare that Defendant has violated and continues to violate the AWA, 7 U.S.C. §§ 2134, 2140, 2142, and 2143(a)(1), (2), and its implementing regulations and standards;

3. Preliminarily enjoin and restrain Defendant from violating the AWA by placing the health of animals at its facility in serious danger, 7 U.S.C. § 2159;

4. Preliminarily and permanently enjoin and restrain Defendant from violating the AWA and its implementing regulations and standards, 7 U.S.C. § 2146(c); and

5. Grant other relief that the Court deems just and proper.

DATED: September 6, 2024          Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

*/s/ Kathryn G. Andrachik*
Kathryn G. Andrachik (OH 0093998)
Elizabeth A. Deucher (OH 0095442)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3804/3712
(216) 522-2404 (facsimile)
Kathryn.Andrachik@usdoj.gov
Elizabeth.Deucher@usdoj.gov

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Devon L. Flanagan*
DEVON L. FLANAGAN
Senior Trial Attorney (D.C. Bar No. 1022195)
KAMELA A. CASCHETTE
Trial Attorney (New York Bar)
TAYLOR A. MAYHALL
Trial Attorney (MN Bar No. 0400172)
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
devon.flanagan@usdoj.gov
kamela.caschette@usdoj.gov
taylor.mayhall@usdoj.gov
Phone:   (202) 305-0201 (Flanagan)
              (202) 305-0340 (Caschette)
              (202) 598-3796 (Mayhall)
Fax:       (202) 305-0275

*Attorneys for the United States of America*

## **EXHIBIT LIST**

Exhibit 1 - July 22, 2024 Relicensing Inspection Report

Exhibit 2 - September 15, 2022 Inspection Report

Exhibit 3 - October 21, 2022 Inspection Report

Exhibit 4 - November 3, 2022 Inspection Report

Exhibit 5 - March 23, 2023 Inspection Report

Exhibit 6 - April 20, 2023 Inspection Report

Exhibit 7 - September 14, 2023 Inspection Report

Exhibit 8 - November 2, 2023 Inspection Report

Exhibit 9 - November 2, 2023 Inspection Report – Direct Citations

Exhibit 10 - February 12, 2024 Inspection Report

Exhibit 11 - March 20, 2024 Inspection Report

Exhibit 12 - July 22, 2024 Focused Inspection Report